IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES EDWARD KING, | No. C 00-01988 SI |
| Petitioner, | **ORDER GRANTING SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| MICHAEL S. EVANS, Warden | |
| Respondent. | |

On April 8, 2009, the Court conducted an evidentiary hearing on James Edward King's second amended petition for a writ of habeas corpus. Having considered the arguments of the parties, the papers submitted, the evidence presented at the hearing, and for good cause shown, the petition is GRANTED.

## BACKGROUND

**1.   Procedural Background**

Following a jury trial in Monterey County Superior Court in 1997, petitioner was convicted of three counts of aggravated sexual assault of a child and one count of committing a lewd act upon a child, and was sentenced to 35 years to life in prison. His conviction was affirmed by the California Court of Appeal on March 25, 1999. On June 3, 1999, the California Supreme Court denied his petition for review. Petitioner filed a petition for habeas corpus, which the California Court of Appeal summarily denied on December 30, 1998. The California Supreme Court summarily denied his petition for review on March 24, 1999.

In 2000, petitioner filed a "mixed" federal petition for habeas corpus containing unexhausted claims relating to ineffective assistance of counsel. In 2001, this Court dismissed the petition for failure to exhaust state remedies. On April 8, 2002, the Court set aside the judgment dismissing the petition, finding gross negligence on the part of petitioner's appellate attorney. The Court stayed this action while petitioner exhausted his state court remedies. On October 29, 2002, the Superior Court denied the petition as untimely and the California Court of Appeal affirmed on February 5, 2003. The California Supreme Court denied petitioner's writ of habeas corpus on May 19, 2004 with a one-sentence opinion citing two cases barring review of habeas petitions filed after substantial delay: *In re Clark*, 5 Cal. 4th 750 (1993) and *In re Robbins*, 18 Cal. 4th 770 (1998).

Petitioner then filed his amended petition on November 4, 2004, bringing both his procedurally defaulted claims of ineffective assistance of trial and state appellate counsel, as well as his previous claims that were denied by the California Supreme Court in 1999. On March 21, 2005, this Court denied some of petitioner's habeas claims on the merits and some as procedurally barred pursuant to the state timeliness rule. On appeal, the Ninth Circuit vacated the denial in part and remanded on the issue of whether California's timeliness rule is an "adequate" procedural bar. *King v. Lamarque*, 464 F.3d 963, 968 (9th Cir. 2006). In an order issued July 23, 2008, this Court determined that respondent had failed to meet its burden of showing that the "substantial delay" standard in noncapital habeas corpus cases had been sufficiently clarified by the California courts by 1999 and therefore held that the timeliness rule was not an adequate state procedural ground to bar federal review. Accordingly, this Court denied respondent's motion to dismiss the petition and gave the parties the option of supplementing their original briefing on petitioner's substantive claims. Now before the Court is petitioner's amended petition for a writ of habeas corpus.

**2.    Trial Background**

The California Court of Appeal described the facts of this case as follows:

Jaime,[1] who turned 13 in June 1997, testified that defendant forcibly engaged in sex with her the week prior to the Salinas air show, which took place on August 2 and 3, 1997. Defendant did not testify at trial.

Jaime and her mother rented rooms in a Salinas house from Douglas Dobell. Defendant was a former tenant who occasionally visited with his friend, Erik Barton. At the time Jaime's mother was a prostitute who was abusing alcohol and methamphetamine, a stimulant.

One afternoon when Barton and defendant visited, they drank beer with Jaime's mother. Jaime's mother thought it was the Saturday of the air show. Jaime thought it was a weekday before the show. Jaime's mother testified that she flirted with Barton. They went into her bedroom. Defendant asked if it was okay if Jaime went to the store with him. Jaime's mother gave him money for beer and cigarettes. Jaime's mother and Barton took a long shower together, long enough for the hot water to run out.

Defendant took Jaime in his car to a nearby liquor store and got beer and soda pop. On the way back, according to Jaime, defendant "pretended to get lost," driving the wrong way. He yelled at her to spread her legs. She said "no." He put his hand between her legs and pushed them apart. He slipped his hand past her purple shorts and her underwear and put two fingers inside her "private spot." She kept telling him "no."

When they returned to her house, defendant put the beer away. Jaime's mother and Barton were in her bedroom with the music on. Jaime started reading a book. Jaime did not try to talk to her mother, even when she came out briefly to get a beer. Defendant said he wanted to show Jaime something. He grabbed her arm and dragged her to the garage. He put his hand over her mouth and told her to keep quiet.

In the garage defendant told Jaime to lie down. She complied, lying on a blue carpet which was on top of a beige carpet. He unzipped his pants and made her touch his penis. He kneeled and took both of her hands in one of his and held them above her head. He put his penis in her mouth. He pulled her shorts and underwear inside and "stuck his private spot in mine." He moved up and down.

Defendant got up and returned with a beer from the house. He put his penis in her mouth and ejaculated. Some of the white stuff went onto the blue carpet. Jaime swallowed when defendant told her to.

Defendant removed Jaime's shirt and bra and kissed her chest. He again raped her, pushing real hard. Before defendant let Jaime up he said he would kill her if she told anyone.

When Jaime's mother came out of the bedroom, she saw Jaime on one couch and defendant on another. Jaime looked very distressed, as though she had been crying. Jaime's mother kept asking her what was wrong. Jaime said, "nothing." Jaime did not want to tell her mother what happened because she was afraid of defendant and because she was afraid her mother would fly off the handle.

The same day Jaime told her best fiend, Erica, that defendant had raped her.

At trial Jaime denied hugging defendant. Erica testified that she saw Jaime hug defendant on three occasions.

After a couple of weeks, when defendant had stopped coming around, Jaime told her mother that defendant had raped her. Her mother was upset.

Jaime's mother told a few people about it, including Dobell. Dobell called the police before Jaime's mother got the full story from her. The police came out and investigated, talking to Jaime and her mother. Jaime and her mother moved out of Dobell's house that night.

On August 14, 1997, Jaime told Salinas Police Officer Kenneth Wynne about what defendant did. Wynne told Salinas Police Officer William Hickman to retrieve the

---

[1] The appellate court referred to the complainant as "J" to protect her privacy. This Court omits complainant's surname for the same reason, but includes the first name as this name appears throughout the record in this case.

3

carpet. Hickman retrieved a light tan carpet from the garage. Hickman did not get the clothing Jaime was wearing because she said they had been washed.

Chemical testing of the tan carpet revealed no seminal fluid. Jaime and her mother explained that defendant raped Jaime on a blue Oriental carpet that was on top of the other carpet. Jaime's mother had washed the blue carpet and set it out in the garage to dry. According to Jaime, by the time she talked to the police, the blue carpet had been moved into the house and thrown out, because it was soiled. When the police first informed Jaime that the carpet test revealed no semen, she said that the carpet had been cut up after a dog chewed it.

Dr. Valerie Barnes examined Jaime on August 19, 1997. A microscopic examination of Jaime's mouth and vagina revealed some erythema or inflammation, some lesions, and a cleft in her hymen. Jaime also had a venereal fungal infection, which was not necessarily sexually transmitted. While some vaginal erythema was attributable to Jaime's infection, the notch in her hymen and the localized type of erythema, including one in her mouth, were likely results of injury. These findings were consistent with Jaime's report of digital and penile penetration. They were unlikely to have resulted from a pre-puberty rape, since earlier trauma would have healed. Jaime testified that she had been raped at the ages of 4 and 8.

Jaime's mother was later arrested and convicted of the felony of possessing stolen credit cards.

Erik Barton testified for defendant, his friend of 13 years. He denied that he had either sex or a long shower with Jaime's mother that day. He said they listened to a taped song in her room. Jaime gave defendant a hug, as she usually did. Jaime and defendant made a short trip to the store for beer and cigarettes, returning in about 15 to 20 minutes. Defendant was in the patio when Barton came out of Jaime's mother's bedroom. Jaime was on the couch. She went outside to go skating. Defendant and Barton helped Jaime's mother by moving furniture before they left.

*See People v. King*, No. H018094, slip op. at 1-6 (Cal. Ct. App. Mar. 25, 1990), footnote omitted.

### 3. Evidentiary Hearing

On April 8, 2009, this Court conducted an evidentiary hearing[2] to assist the Court in deciding petitioner's claim that he received ineffective assistance of counsel at trial because his attorney failed to consult or present testimony from a medical expert. The witnesses at the hearing were: John Howell (petitioner's trial counsel), Lee Coleman, MD (petitioner's medical expert), and Valerie Barnes, MD (respondent's medical expert, who examined Jamie before trial and testified at trial).

In support of petitioner's habeas corpus motion, Mr. Howell stated in a declaration that he was aware before trial that Dr. Barnes would testify as a sexual assault expert for the prosecution. *See* Petitioner Mot., ex. 6 (Decl. of John Howell) ¶ 6. He also stated that he could recall no tactical reason for failing to consult an expert to review Dr. Barnes' findings. *Id.* At the evidentiary hearing, Mr.

---

[2] The hearing lasted between four and five hours.

4

1 Howell affirmed the statements in his declaration. He testified that before petitioner's trial, he had

2 consulted experts on "all kinds of" forensic subjects, and that he maintained a binder with a list of

3 experts on different subjects. He was also familiar with an institute, then located in Oakland, that could

4 have recommended a medical expert, had he sought advice. Mr. Howell requested that the prosecution

5 provide him copies of the photographs taken during the complainant's physical examination, but he said

6 he had no basis of knowledge to interpret the photographs or Dr. Barnes' report. Instead, he prepared

7 by reading the report and looking up unfamiliar words in a dictionary. When asked on direct

8 examination why he had not at least consulted with a medical expert for help preparing his cross

9 examination, Mr. Howell said, "I really can't give you a reason. I wish that I had." On cross

10 examination, Mr. Howell agreed with counsel that he had relied on "common sense" for developing his

11 trial strategy, and that he had concentrated mainly on attacking Jamie's credibility.

12 Dr. Barnes testified at trial that when she examined Jaime, she noticed several areas of genital

13 erythema (redness or inflammation). *See* Exs. B(1-3), Reporter's Transcript ("RT") at 268:3-14.

14 [Docket No. 73] She also observed "two little red spots" on the hymen. *Id.* at 268:17-18. The

15 government asked Dr. Barnes about the cause of the red marks:

16 Q: Are those corporeal injuries?
A: They're consistent with injuries.
17 Q: Are those – the lesions you were talking about, would those be consistent with, say, penetration of a foreign object?
18 A: They could be.
Q: Could they be caused by something else?
19 A: They would be caused by an injury, whether by penetration or someone scratching.

20 *Id.* at 268:20-28.

21 Dr. Barnes also testified that she made the following observations: (1) a "cleft" in the hymen,

22 RT 269:6, that in her opinion was consistent with injury because it was in a position where injuries

23 "classically" occur, RT 271:18-28; (2) "thick, white" discharge at the hymen, which tested positive for

24 a fungal venereal infection, RT 274:10-26, which is "extremely common" and "not a sexually

25 transmitted disease", RT 275:5-12; (3) "very slight" uptake of toluidine blue (a dye that reveals

26 inflammation or damaged cells), which is "consistent" with both infection and "penetration with a

27 foreign object" RT 275:27-276:27; and (4) "red streaks" on the lower lip of the cervix, RT 277:17-18,

28 which can be caused "from injury or from infection," RT 278:6. In addition, Dr. Barnes testified that

5

1 she observed a "circular red area" on the soft palate of Jamie's mouth. RT 279:3-9. Throughout her testimony, Dr. Barnes asserted that while the genital abnormalities she observed could be caused by infection, the cause here was more likely penetration or trauma. She also testified that although Jamie had told Dr. Barnes during the examination that Jamie was sexually molested when she was eight, the abnormalities Dr. Barnes observed were not caused by the earlier incident. RT 283:16-27.

In sum, the evidence Dr. Barnes gathered during her physical examination was not conclusive. She observed a cleft on the hymen, several areas of erythema, discharge, slight uptake of toluidine blue, and a red area on the palate. While in Dr. Barnes' opinion, the most likely cause of these abnormalities (other than the discharge, which she testified was unrelated to trauma) was physical penetration, she also testified that they many of her findings could be caused by infection.

In support of his habeas corpus petition, petitioner offered a declaration from Dr. Coleman, who also testified as a defense expert at the evidentiary hearing. *See* Petitioner Mot., ex. 5 (Coleman Decl.) ¶¶ 1-3. Dr. Coleman has been licensed to practice medicine in California since 1967. He obtained a medical degree from the University of Chicago School of Medicine in 1964 and completed an internship in pediatrics at Children's Medical Center in Seattle in 1965. *See* Respondent Evidentiary Hearing Exhibit 16. He testified at the hearing that he performed genital exams on children during his pediatric internship and while assigned to an emergency room rotation during his military service. Although he has not performed physical examinations in the last thirty years, he is familiar with the medical-legal protocols required by the State of California in sex abuse cases and has reviewed "hundreds" of medical examination reports. Coleman Decl. ¶ 3. The Court found that Dr. Coleman was qualified through his experience and training to offer an expert opinion on the evidence from the physical examination in this case and to testify about scientific research on evidence from sex abuse cases.

In Dr. Coleman's opinion, Dr. Barnes' trial testimony that the red area on the palate was "consistent with" oral sex is akin to opining that "short hair is 'consistent with' an allegation of bank robbery or murder." *Id.* ¶ 7. That is, "a small area of redness on the palate is so non-specific as to be completely meaningless for any forensic purpose." *Id.* He also opined that Dr. Barnes' description of erythema "are so common as to be . . . meaningless, regarding an accusation of prior sexual abuse." *Id.* ¶ 8. Moreover, Dr. Barnes' observation of "copious discharge" indicates that Jamie had a pelvic

6

infection at the time, which, in Dr. Coleman's opinion, is a far more probable explanation for erythema: "Erythema is, of course, an inevitable component of such infections, so to attribute this to anything sexual is completely absurd and . . . indicative of bias." *Id.* As for the cleft Dr. Barnes observed on the hymen, Dr. Coleman claimed that the photographs supplied by Dr. Barnes are "completely inadequate for independent review," so he had to accept Dr. Barnes' trial testimony that she indeed observed such a cleft. *Id.* ¶ 11. In Dr. Coleman's opinion, the abnormality described by Dr. Barnes "is in fact a normal variation, in no way indicative of prior injury." *Id.* In support of this view, Dr. Coleman cited several scholarly articles (at least one of which was published before 1997), that apparently conclude that "so called 'notches' or 'clefts' in the hymen occur in many girls who have no history of sexual contact. They are normal. The claim sometimes made, that such 'clefts,' when located in the posterior position as here, are more significant than at other positions, has not been borne out by research studies." *Id.*

At the evidentiary hearing, Dr. Coleman offered a further opinion on the purported notch. Shortly before the hearing, he procured digital copies of the actual photographs taken during the physical exam in 1997. He said that the digital copies were clearer than the versions of the photographs that were offered as trial exhibits (Dr. Coleman also visited the courthouse in Salinas to view the trial exhibits). The original photographs, in Dr. Coleman's opinion, show that the purported cleft was not located on the hymen at all but was actually in the vaginal wall behind the hymen.

Dr. Coleman offered the following summation of the physical evidence: "the only bona fide abnormality described is erythema (redness), something that is an inevitable accompaniment of pelvic inflammations, the very thing that this girl had at the time of the examination. Such findings are not evidence for any prior sexual contact." *Id.* ¶ 13.[3] He reiterated this conclusion at the evidentiary

---

[3] In his declaration, Dr. Coleman opined that the physical evidence was *inconsistent* with penile penetration because the horizontal measurement of the hymen was so small that "[there is no way penile penetration could be accomplished without major tearing injury to this girl." *Id.* ¶ 9. In his testimony at the evidentiary hearing, Dr. Coleman qualified this assertion. He stated that measurements of vaginal opening size are so unreliable that it would be difficult to draw any firm conclusions from any such measurement. Rather, he asserted that the measurement and the apparent lack of tearing were inconsistencies that Dr. Barnes should have noted in her report. Dr. Barnes testified at the evidentiary hearing that she only made the measurement because it was required on the State's form, but that she paid little attention to it because such measurements are not reliable. The experts therefore appeared to agree that little meaning can be derived from the vaginal opening measurement. Dr. Barnes did not testify about this measurement at the trial.

7

hearing, testifying that when physical evidence is examined for signs of sexual abuse, "all bets are off" when, as here, the complainant has a pelvic infection at the time of the examination.

Dr. Barnes, a pediatrician who has made some 535 colposcopic[4] exams since 1992, offered rebuttal testimony at the evidentiary hearing. She largely repeated the conclusions she offered in her trial testimony, testifying that the brightness of the erythema on the cervix was unlike erythema from infection, that the red spots on the hymen had "nothing to do" with a yeast infection, that the uptake of the toluidine blue was "much more" consistent with infection than with injury, and that the red mark on the palate was (based on her examination of thousands of children's mouths) unusual and most likely a "resolving bruise" from recent forced oral copulation.

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d).

Where, however, the state court has rejected a claim on procedural grounds, rather than on the merits, § 2254(d) does not always apply. If a federal court concludes that an asserted procedural bar was not an independent and adequate ground for the state court decision, the federal court must consider the claim on the merits; if the state courts never reached the merits of the claim, there is no state court decision to which to defer and the federal court must review the claim *de novo*. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002); *see also Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

---

[4] A colposcope is a medical instrument that magnifies the genitals and can be used to take pictures during a genital exam. In this case, Dr. Barnes used a colposcope to take the photographs which were introduced as exhibits during petitioner's trial. In the photographs, the genitals were magnified fifteen times.

8

As described more fully above, this Court has already determined that the state procedural bar was not an independent and adequate ground for the state court's denial of petitioner's claims. Accordingly, the Court must review those claims *de novo*.

**DISCUSSION**

Petitioner argues that his trial counsel was ineffective in failing to consult a sexual assault expert and failing to present evidence in petitioner's defense. The Sixth Amendment right to counsel guarantees effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* A habeas petitioner must establish two things to prevail on a Sixth Amendment ineffectiveness claim: (1) that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-688; and (2) that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. As to the first prong, the relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

**1.  Sexual Assault Expert**

   **A.  Performance**

Petitioner contends that his trial counsel performed unreasonably by failing to seek the assistance of an expert in interpreting the evidence from Dr. Barnes' examination of Jaime in August of 1997. The Court found Mr. Howell credible at the evidentiary hearing and accepts his testimony that when necessary, it was his usual practice to seek expert help for assistance in trial preparation, that a medical expert would have been helpful in this case, and that he simply had no reason for failing to consult an

9

expert. The Court also notes that had Mr. Howell filed a motion seeking an expert, the court would have been required to appoint one at the county's expense. *See Corenevsky v. Superior Court*, 36 Cal. 3d 307, 318-320 (1984).

The Court rejects respondent's suggestion (made through cross examination of Mr. Howell at the evidentiary hearing) that applying "common sense" would be a reasonable way for a lawyer to analyze the colposcopic pictures. Magnified fifteen times, many of the images might not even be recognizable to a lay person as pictures of genitals. *See* Respondent's Evidentiary Hearing Exs. 3-4, 8-12. A lay person certainly would not be able to discern whether the pictures showed abnormalities. The notion that a lawyer without medical training could develop cross-examination questions that would convincingly challenge a pediatrician's interpretation of these photographs is not plausible.

Respondent also suggested (again through cross examination of Mr. Howell at the evidentiary hearing) that Mr. Howell was able to cross-examine Dr. Barnes competently. At trial, Dr. Barnes admitted on cross-examination that genital erythema can be caused by an infection, masturbation, rubbing, bed-wetting, and scratching. *See* RT 289:3-12, 290:20-28. She also conceded that uptake of toluidine blue can be caused by an infection. RT 295:26-27. The Court disagrees that these admissions, which confirmed her testimony on direct that trauma was not the only possible cause of the abnormalities, demonstrate that the "common sense" approach was reasonable. Mr. Howell had no tools to attack Dr. Barnes' opinion as a pediatrician that the *better* explanation for the medical evidence was trauma.

Peter Leeming, a defense attorney who has practiced criminal defense since 1986 and is based in Santa Cruz, California, stated in a declaration offered in support of the habeas corpus petition that failure to consult a medical expert in sexual abuse cases falls below the standard of practice for defense attorneys. He attested that "[w]henever the prosecution in a case involving charges of digital penetration and rape of a child is based upon the physical findings of a physician, it is unreasonable for a defense attorney not to consult a sexual expert concerning those findings." Petitioner Mot., ex. 7 (Decl. of Peter Leeming) ¶ 3. In addition, Mr. Leeming contended that "[w]hen the prosecution claims that the physical findings are consistent with the complaining witnesses' history of alleged assault, there

10

can be no rational, tactical basis for failing to consult such an expert, at least absent blatant evidence of genital injury apparently caused by sexual assault." *Id.*

In sum, petitioner offers credible evidence that his trial attorney can recall no tactical reason for failing to consult a medical expert before trial and that the attorney's failure to do so falls below the standard of practice. Petitioner also presents credible evidence that if a competent medical expert had testified in petitioner's defense, the expert could have opined that the physical abnormalities were either forensically meaningless or more consistent with infection than penetration. (The Court does not mean for its conclusions about the necessity of a defense expert to question the skill of Dr. Barnes. The point is simply that, as Dr. Barnes conceded, the evidence was capable of more than one interpretation. Without expert testimony for the defense, the jury was denied the opportunity to hear anyone with medical expertise challenge Dr. Barnes' opinion that trauma was a more likely cause than infection.) Finally, had trial counsel requested a medical expert, the court would have been required to appoint one at the county's expense. In light of the totality of the circumstances of this case, the Court agrees with petitioner that it was unreasonable for trial counsel to fail to seek the assistance of a medical expert.

Respondent argues that deficient performance cannot be established by failure to consult a medical expert. The cases respondent relies on do not stand for as broad a proposition as respondent claims. In *Bonin v. Calderon*, the Ninth Circuit noted that "the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense." 59 F.3d 815, 834 (9th Cir. 1995). *Bonin* thus stands for the limited proposition that expert advice is of course not *always* required. Curiously, respondent also cites *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001). In the portion of the opinion cited by respondent, *Miller*, like *Bonin*, notes that a defense lawyer "does not have a duty in every case to consult experts . . . ." *Id.* at 459. In the immediately preceding sentence, however, *Miller* held that "in the circumstances (an essential qualification), there was also no excuse for the lawyer's failure to consult experts on hair, DNA, treadmarks, and footprints." *Id. Miller* therefore supports petitioner's contention that in some cases, experts are so crucial to the defense that a failure to seek their advice is unreasonable. *Accord Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory,

11

1 defense counsel's failure to present expert testimony on that matter may constitute deficient
2 performance.") (citing *Caro v. Woodford*, 280 F.3d 1247, 1254-56 (9th Cir. 2002) (holding that counsel
3 was deficient for failing to consult an expert and present expert testimony about the physiological effect
4 of toxic chemical exposure on defendant's brain)).

5       Two Second Circuit cases emphasize that expert testimony may be crucial in sex abuse cases
6 that require interpretation of "the vagaries of abuse indicia." *See Pavel v. Hollins*, 261 F.3d 210, 224
7 (2d Cir. 2001) (citing *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001)); *Lindstadt*, 239 at 201
8 (finding defense counsel ineffective for, among other things, failing consult an expert who could have
9 brought to light studies, accepted for publication in the early 1990s, that found irregularities (i.e. "bumps
10 and clefts") on the hymens of girls who were not abused). Accordingly, the Court rejects respondent's
11 argument that deficient performance cannot be shown through counsel's failure to consult an expert
12 during the pretrial investigation or present expert testimony. The Court finds that the need for a medical
13 expert was especially compelling in this case because of the need to interpret ambiguous physical
14 evidence of purported sexual abuse.

15
16       **B.**    **Prejudice**

17       In order to prevail on his Sixth Amendment claim, petitioner must also demonstrate prejudice,
18 i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the
19 proceeding would have been different." *Strickland*, 466 U.S. at 694. It is easier for a petitioner to prove
20 prejudice when the government's case at trial was weak. *See id.* at 696 ("[A] verdict or conclusion only
21 weakly supported by the record is more likely to have been affected by errors than one with
22 overwhelming record support.").

23       Here, there were gaps in the evidence against petitioner. Jamie, the only witness to the incident,
24 testified that during the assault, she spat semen onto the carpet, RT 80:17-18, and that petitioner
25 ejaculated onto the carpet, RT 117: 11-13. Greg Avilez, a senior criminalist with the California
26 Department of Justice, testified at trial, however, that he tested three pieces of carpet for the Salinas
27 Police Department in this case and that he did not find seminal fluid on any of the samples. RT 337:15-
28 18.

**United States District Court**
For the Northern District of California

1 Jamie also gave contradictory testimony about what happened to the carpet that was present in 2 the garage on the day in question. When a police investigator told her that investigators had been unable 3 to find evidence of semen on the carpet they had taken from the house, Jamie told him that a second 4 carpet had been placed on top of the cream-colored carpet in the garage, but that her dog had chewed 5 part of the second carpet and her mother had subsequently cut the carpet in half with a kitchen knife and 6 thrown the dog-chewed half away. RT 118-120. She also testified that her mother threw the carpet 7 away because the sink flooded on it and her dog urinated on it. RT 90.

8 Jamie's accounts about what happened to the carpet conflicted with those of other witnesses. 9 Ruth Ann (Jamie's mother) testified that there had been a blue carpet in the garage, that she had "no 10 idea" what happened to the carpet, and that the landlord, Doug Dobell, might have hidden it. RT 31. 11 For his part, Dobell testified that the only carpet he had ever seen in the garage was off-white. RT 368.

12 Jamie also testified that she had been raped when she was four and when she was eight, RT 13 101:5-15, and that on the latter occasion – just as in this case – the man took her to a convenience store. 14 RT 125:18-28.

15 Finally, Jamie testified that the episode in the garage occurred in front of a diamond-shaped 16 window in the door between the garage and the kitchen. RT 116:18-117:1.

17 The jury could have found that the inconsistencies in Jamie's testimony about the carpet, her 18 previous allegations of rape, and her contention that petitioner (who would have been familiar with the 19 house) raped her in front of a window while Ruth Ann was home detracted from Jamie's credibility. 20 The fact that the jury nonetheless found for the prosecution suggests that the medical evidence played 21 an important role in the jury's decision to convict.

22 In his closing argument, the prosecutor acknowledged the weaknesses in his case. He noted that 23 Ruth Ann was "manic depressive, borderline multiple personality disorder . . . on a number of 24 prescription drugs, illegal drugs, narcotics, former crack addict, prostitution. She was a mess. . . . Mom, 25 frankly, can't remember a whole lot." RT 400-401. He characterized the police work as "sloppy." He 26 told the jury, "I don't know what [investigator] Hickman was doing. Hickman missed a bunch of stuff 27 that you would like to have. But it isn't here. The clothes aren't here. Just 'cause they aren't here 28 doesn't mean it didn't happen." RT 408:22-26.

13

The prosecutor compensated for these weaknesses in part by emphasizing the importance of Dr. Barnes' testimony:

> There was trauma to [the cervix]. It wasn't trauma from an infection. It was trauma through injury. RT 403:26-28.
>
> [T]he question is: If you don't believe Jamie . . . then how do you explain this stuff? Some of it's an infection. Okay. . . . But some of it doesn't get there except for injury, and that's what the doctor said. RT 407:3-8.
>
> You know what's really telling here on this stuff? This is the bottom of the vagina, the entry where the penis would hit. If it was entering where the penis hit, and when it entered, Toluidine Blue uptake, two weeks later, roof of the mouth, healing bruises, cleft from postpubertal injury, the hymen. RT 407:15–20.
>
> Her testimony's corroborated by medical evidence. In the end you can't doubt that evidence. RT 410: 25-28.
>
> [W]hat I keep wondering about is how the cleft got caused and how that damage on the roof of the mouth got there and how these healing bruises got there. But worse, how the damage to the cervix way up inside got there; semen or no semen. RT 444:15-20.
>
> Toluidine Blue, healing bruises, cleft, consistent with her story; not consistent with any other evidence. RT 445: 15-17.
>
> And you know, in the end, in the very end, you cannot get away from the photos, from the medical testimony. RT 448:14-19.

The jury sent the court a note during its deliberations that suggests the medical evidence was material to its decision to convict. The note contains two questions, apparently written in two different handwriting styles. The photocopy of the note entered into evidence by petitioner during the evidentiary hearing was unclear, but it appears to read as follows:

> Was the result of the toluidine blue stain c/w [consistent with] foreign body penetration two weeks old?
> What other conditions would produce such a symmetric staining pattern in the posterior fourchette area of the vagina?

Pet. Evidentiary Hearing, Ex. E.

In light of the admitted problems with the other physical evidence and the challenges to Jamie's credibility, the prosecutor's focus on the physical evidence in his closing statement, and the jury's note seeking clarification of the medical evidence, it is reasonable to assume that the medical evidence was material to the jury's finding of guilt. The Court therefore concludes that had Dr. Coleman (or a similar expert) had been allowed to testify at trial, this evidence would have been a powerful challenge to Dr. Barnes' testimony. A medical expert could have made two attacks on Dr. Barnes' opinion that the

hymenal notch was proof of recent abuse: (1) the expert could have opined that scientific research available in 1997 showed serious weaknesses with the notion that hymenal notches or clefts correlate to sex abuse, and (2) that, even accepting that a notch has some significance, the evidence in this case showed there was no such notch.[5] A medical expert also could have opined that there was no medical reason to draw a correlation between the red mark on the palate and sexual abuse, and that the non-sexually transmitted fungal infection is the only reasonable explanation for the erythema.

Respondent argues that petitioner cannot establish prejudice because Dr. Coleman's areas of expertise (in psychiatry and forensics) would made him less convincing to the jury than Dr. Barnes, who has specialties in pediatrics and years of experience performing genital examinations on children. As noted above, the Court found Dr. Coleman qualified as to offer expert opinions on the physical evidence in this case and scientific research in this area. The Court also found his testimony credible and convincing. It is possible that the jury might have found that Dr. Barnes' practical experience carried more weight than Dr. Coleman's experience reviewing medical examination reports. At the same time, it is not reasonable to argue, as respondent does, that no rational juror could have found Dr. Coleman more convincing than Dr. Barnes.

Considering all of the circumstances of the case, the Court concludes that the testimony of a defense medical expert could have caused the jury to reject Dr. Barnes' testimony and thus changed the outcome at trial. Accordingly, the Court finds that there is a "a reasonable probability" that "the result of the proceeding would have been different," *see Strickland*, 466 U.S. at 694, but for trial counsel's failure to consult a medical expert during his pretrial investigation and his failure to present expert testimony at trial. Petitioner has therefore established that his Sixth Amendment right to a fair trial was violated by trial counsel's ineffective representation.

---

[5] The Court notes that during the evidentiary hearing, Dr. Barnes implied that clinicians who gather evidence in medical-legal exams now no longer pay attention to clefts or notches on the hymen because the prevailing view is that these features are not evidence of abuse. Of course, the Court cannot consider Dr. Barnes' current opinion on this matter and must imagine what her rebuttal testimony would have been in 1997, when she espoused the view that a notch or cleft "at the six o'clock position" was "absolutely traditional" evidence of injury. RT 271:24-27.

15

//

## 2.  Evidence of Mother's Motive to Falsely Accuse Petitioner

Petitioner claims that his trial counsel was ineffective for failing to present evidence that Ruth Ann, the victim's mother, had a motive to falsely accuse him. According to petitioner's declaration, Ruth Ann threatened to get even with petitioner for interfering in her attempt to sell a motorcycle belonging to Dobell (the landlord) without Dobell's knowledge. Petitioner Mot., ex. 1 (Decl. of James King) ¶ 4. Petitioner contends that Ruth Ann was irate about petitioner's interference because she feared that Dobell would evict her if he discovered she had tried to sell his motorcycle. *Id.* ¶ 4. Ruth Ann also allegedly believed that a man with whom she had sexual intercourse had AIDS, and that petitioner knew about his condition but had not warned her beforehand. *Id.* ¶ 5. Petitioner claims Ruth Ann threatened to get even with him because she believed petitioner had jeopardized her health. *Id.* Mr. Howell attests that he knew of Ruth Ann's threats before trial and can recall no tactical reason for failing to explore this issue at trial. *Id.*, ex. 6 ¶¶ 4, 5.

The Court finds that it was not objectively unreasonable for trial counsel not to impeach Ruth Ann for bias. As discussed above, the prosecutor admitted in closing that Ruth Ann "can't remember a whole lot" and was "manic depressive, borderline multiple personality disorder . . . on a number of prescription drugs, illegal drugs, narcotics, former crack addict, prostitution." RT 400-401. A defense attorney could reasonably have concluded that Ruth Ann was not a strong witness for the government and that effort impeaching her testimony would be misdirected. *See Horton v. Mayle*, 408 F.3d 570, 576-77 (9th Cir. 2005) (failure to impeach witness with prior felony convictions not ineffective when jury knew that witness was a drug user, had a criminal history, and was an admitted liar).

Accordingly, the Court rejects petitioner's second basis for his Sixth Amendment claim.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court now orders:

1. The petition for writ of habeas corpus is GRANTED.

2. King's conviction in Monterey County Superior Court is VACATED and respondent must release King from custody within sixty days of the date this order is filed unless the State of California

16

reinstitutes criminal proceedings against him.

3. The clerk shall send a copy of this order to the Monterey County Public Defender's Office. The Court requests that the Monterey County Public Defender obtain representation for King in connection with his return to state court if he meets the eligibility requirements.

**IT IS SO ORDERED.**

Dated: April 14, 2009

SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California